459-07PJG/PLS

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Peter J. Gutowski (PG 2200)
Pamela L. Schultz (PS 8675)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
AQUIDNECK SHIPPING CORP.,

                                 Plaintiff,

      -against-

OCEAN AND OIL LTD.,

                                 Defendant.
-------------------------------------------------------------x

**RECEIVED**
SEP 18 2007
U.S.D.C. S.D.N.Y.
CASHIERS

Judge Berman

**07 CIV 8152**
07 Civ.

**VERIFIED COMPLAINT**

Plaintiff, AQUIDNECK SHIPPING CORP. (hereinafter "AQUIDNECK") for its

Verified Complaint against Defendant OCEAN AND OIL LTD. (hereinafter "OCEAN"), alleges

upon information and belief as follows:

      1.    This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party. This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C.

§1331 in that the action arises under the New York Convention on the Recognition and

Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal

Arbitration Act, 9 U.S.C. §1 *et seq.*

2.     At all times material hereto, Plaintiff AQUIDNECK was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 3rd floor, Par a Ville Place, 14 Par-la-ville Road, Hamilton, Bermuda.

3.     At all times relevant hereto, Defendant OCEAN was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 5 Arlington Street, 2nd Floor, London SW11RA, United Kingdom.

4.     Defendant OCEAN utilizes other entities as paying or funding agents for purposes of receiving, holding and/or transferring funds, including but not limited to Ocean and Oil Trading Ltd. which entity is used to hold, transfer, receive and/or is in possession of assets of Defendant OCEAN.

5.     On or about April 14, 2007, Plaintiff, in the capacity as owner of the M/T AQUIDNECK, entered into a maritime contract of charter party with Defendant OCEAN, as charterer, for the carriage of a gasoil. A copy of the charter party recap, pro forma charter party and additional clauses are annexed as Exhibit A.

6.     Plaintiff duly tendered the vessel into service under the charter, the voyage was performed and demurrage earned.

7.     Plaintiff submitted an invoice for the demurrage due under the charter party in the amount of $122,786.42. A true and correct copy of the demurrage invoice is attached hereto as Exhibit B.

8.     In breach of the terms of the charter party, and despite due demand OCEAN has refused and/or otherwise failed to pay the amounts due and outstanding under the charter party, and a balance of $57,505.66 remains due and owing.

9.    The charter party provides for the application of English law and disputes between the parties may be resolved by arbitration in London, and AQUIDNECK specifically reserves its right to arbitrate the substantive matters at issue.  AQUIDNECK has given notice to OCEAN of its appointment of an arbitrator for purposes of resolving the disputes between the parties.

10.    This action is brought to obtain jurisdiction over OCEAN and to obtain security in favor of Plaintiff AQUIDNECK in respect to its claims against OCEAN and in aid of London proceedings.

11.    Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable as part of Plaintiff's claim.

12.    This action is further brought to obtain security for any additional sums to cover Plaintiff's anticipated attorney and arbitrators' fees and costs in the London arbitration and interest, all of which are recoverable as part of Plaintiff's claim under English law.

13.    Plaintiff estimates, as nearly as can be computed, that the legal expenses and costs of prosecuting the claim in London arbitration will be $15,000 and interest on its damages are estimated to be $8,561.55 (calculated at the rate of 7% for a period of two years, the estimated time for completion of the proceedings in London).

**Request for Rule B Relief**

14.    Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts,

wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in its name or for its benefit, including those in the name of its paying or funding agent Ocean and Oil Trading Ltd., at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

15.    The total amount to be attached pursuant to the calculations set forth above is $81,067.21.

WHEREFORE, Plaintiff AQUIDNECK SHIPPING CORP. prays:

a.    That process in due form of law according to the practice of this Court may issue against Defendant citing it to appear and answer the foregoing;

b.    That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including **$81,067.21** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held, received, or transferred in its name or as may be held, received or transferred for its benefit, including those in the name of its paying or funding agent Ocean and Oil Trading Ltd., at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees

who may be served with a copy of the Process of Maritime Attachment and

Garnishment issued herein;

c.    That this Court retain jurisdiction over the matter for any subsequent enforcement

action as may be necessary; and

d.    For such other, further and different relief as this Court may deem just and proper

in the premises.

Dated: New York, New York
       September 18, 2007

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff AQUIDNECK
SHIPPING CORP.

By: _____
          Peter J. Gutowski (PG 2200)
          Pamela L. Schultz (PS 8675)
          80 Pine Street
          New York, NY 10005
          (212) 425-1900

## ATTORNEY VERIFICATION

State of New York    )
                    ) ss.:
County of New York  )

PETER J. GUTOWSKI, being duly sworn, deposes and says as follows:

1.      I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.      The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3.      The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

_____
Peter J. Gutowski

Sworn to before me this
_18th_ day of September 2007

_____
Notary Public

MELISSA COLFORD
Commissioner of Deeds
City of New York-No. 5-1692
Certificate Filed in New York
Commission Expires 4/1/2008

-----Original Message-----
From: Anita Krogh [mailto:Anita@nesttun-chartering.no]
Posted At: Thursday, April 13, 2006 12:38 PM
Posted To: CP Details/ Voy orders
Conversation: AQUIDNECK/O+O - CP DATED 13/04/06
Subject: VS: AQUIDNECK/O+O - CP DATED 13/04/06

ATT. HARALD

FOLL FROM CLARKSON,UK

QUOTE

RE: AQUIDNECK/O+O - CP DATED 13/04/06

TO   : OCEAN AND OIL
ATTN : ROD

TO   : NESTUN
ATTN : ERNST

FROM : NEO-CLARKSONS

9/13/2007

EXHIBIT

A

STRICTLY PRIVATE AND CONFIDENTIAL


PLEASED TO CONFIRM FOLLOWING FIXTURE ACCOUNT OCEAN AND OIL LTD, ISLE OF MAN
WITH ALL SUBJECTS LIFTED.


CP DATED          : 13TH APRIL 2006
HEAD OWNER        : AQUIDNECK SHIPPING CORP
          3RD FLOOR, PAR LA VILLE PLACE,
          14 PAR-LA-VILLE ROAD, HAMILTON, BERMUDA

M/T AQUIDNECK
DESCRIPTION - Q88 AS SENT

SHIP          : AQUIDNECK
SDWT          : 40,554 MT
DRAUGHT        : 12.02 M
LOA          : 179.2 M
BEAM          : 30.4 M
BUILT          : 1981
FLAG          : BAHAMAS
CAPACITY AT 98 PCT    : 43,750.9 CBM
SLOP CAPACITY AT 98 PCT :  CBM
SLOP TANK AVAILIABILITY :
TPC          : 46.6 MT
BCM          : 90.32 M
KTM          : 48 M
TYPE OF COATINGS      : EPOXY
TYPE OF HEATING SYSTEM :
HEATING SYSTEM MATERIAL : ONLY SLOP TANKS FITTED WITH ALUBRASS COILS
CLASS          : ABS
DERRICKS/CRANES    : 1 X 10 MT SWL CRANE
GRT          : 23,709

TBOOK WOG VESSEL IS NOT UNACCEPTABLE BY:
SHELL
BP
CHEVRON

LAST 3 CARGOES: PALM OILS / VEG OILS / UAN

POSITION: ETA ROTTERDAM FOR DISCHARGE FULL CARGO 16TH APRIL, ETC 20TH APRIL,
      6 DAYS FOR CLEANING, LOAD READY BASIS ARA 26TH APRIL 2006

CARGO    : MIN 33,000 MTS CPP, GASOIL, CLEAN, UNLEADED, UNDYED,
      UNDARKER 2.5 NPA, WITH MIN SG 0.84 AT LOAD TEMP, 1/2 GRADES WVNS,
      CHOPT FULL CARGO, NDFCAPMQS.

LOAD    : 1 SP ARA, INTENTION AMSTERDAM

DISCHARGE : 1/3 SP(S) AND/OR SBM AND OR STS LOCATIONS WAF DAKAR/LUANDA RGE EXCL

FW: AQUIDNECK/O+O - CP DATED 13/04/06 336002

SIERRA LEONE, LIBERIA, AND ALL UN BANNED COUNTRIES.

LAYCAN    : 26 - 28 APRIL 2006 16:00HRS CANCELLING

FREIGHT   : WS 195, MIN FLAT ABIDJAN

    OVERAGE 100% OF AGREED RATE

    FREIGHT AND ANY UNDISPUTABLE DEMURRAGE INCURRED AT LOAD
    PORT IS PAYABLE BEFORE BREAKING BULK

DEMURRAGE : USD 19,500 PDPR

COMMISSION: 2.5 PCT TO OTS, PLUS 1.25 PCT TO CLARKSONS PLUS 1,25% TO
NESTTUN CHARTERING A/S ON ALL MONIES
EARNED.

- FREIGHT PAYABLE IN USD BY T/T TO: RVTG.

- OWNERS DEMURRAGE CLAIMS SHOULD BE ADDRESSED TO:

  OCEAN AND OIL LTD
  C/O OANDO LTD
  2ND FLOOR
  5 ARLINGTON STREET
  LONDON SW1 1RA

- MAX PORT COSTS DISCH PORTS WAFRICA USD 15,000 FOR OWNERS ACC. BALANCE
FOR CHRTRS ACC.

-L/TIME 84 HRS SHINC.

-WSTC.

-ANY TAXES AND/OR DUES ON CARGO AND/OR FREIGHT TO BE FOR CHRTS ACCT  AND
TO BE SETTLED DIR BY THEM.

- UNDISPUTED DEMURRAGE IN WAF TO BE PAID EVERY 7 DAYS IN ARREARS.

- WAF CLAUSES (BELOW TO INCLUDE IVORY COAST)

  ANY DELAYS IN OBTAINING NIGERIAN TASK FORCE PERMISSION TO ENTER
  OR LEAVE NIGERIAN WATERS TO COUNT IN FULL AS USED LAYTIME OR
  DEMURRAGE IF ON DEMURRAGE INC AWAITING NAVAL CLEARANCE.

  ANY TAXES AND/OR DUES AND/OR LEVIES ON CARGO AND/OR FREIGHT,
  INCLUDING BUT NOT LIMITED TO NIGERIAN CONSERVANCY DUES,
  NIGERIAN HARBOUR DUES, SHIP DUES, HANDLING CHARGES, OIL TERMINAL
  DUES,WHARFAGE, NMA (NATIONAL MARITIME AUTHORITY WHICH CHARTERERS
  TO BE RESPONSIBLE FOR OBTAINING) FEES, AND ANY OTHER ITEMS AS PER
  WORLDSCALE PREAMBLE 12 AND/OR FIXED AND/OR VARIABLE RATE
  DIFFERENTIALS AS PER WORLDSCALE TO BE FOR CHARTERERS' ACCOUNT AND
  TO BE SETTLED BY THEM DIRECTLY.

  ANY DELAYS IN NIGERIA DUE TO LOCKOUTS, STRIKES, RESTRAINTS, WORK
  TO RULE, GO-SLOW, NIGERIAN VETTING CALLS, AND ANY DELAYS DUE TO
  BREAKDOWN/FAILURE/INEFFICIENCY OF MACHINERY AND/OR EQUIPMENT IN
  OR AROUND SUPPLIERS' FACILITIES TO COUNT IN FULL AS LAYTIME OR

DEMURRAGE IF ON DEMURRAGE EXCEPT STRIKE BY VESSELS MASTER,
OFFICERS CREW OR BREAKDOWN,FAILURE,INEFICIENCY OF THE VESSEL.
WATCHMEN IF REQUIRED TO BE FOR CHARTERERS' ACCOUNT.

ANY WAR RISK PREMIUM IN WAFR TO BE FOR CHARTERERS' ACCOUNT.

-TORM INTERIM PORT CLAUSE:
------------------------
 CHARTERERS TO PAY FOR ADDITIONAL INTERIM LOAD/DISCH PORT AT COST WITH
ADDITIONAL STEAMING TIME TO BE INCURRED FOR SUCH DEVIATION WHICH EXCEEDS
DIRECT PASSAGE FROM FIRST LOADPORT TO FINAL DISCHPORT.

 TIME TO COUNT FROM ARRIVAL PILOT STATION INTERIM LOAD/DISCHARGE PORT
UNTIL DROPPING LAST OUTWARD PILOT INTERIM LOAD/DISCH PORT I.E. NO
ALLOWANCE FOR NOTICE TIME, NOR DEDUCTION FOR SHIFTING EVEN FROM
ANCHORAGE TO FIRST BERTH AND NO DEDUCTION FOR TIME LOST DUE TO TIDE, SEA
AND WEATHER CONDITIONS. DEVIATION AND TIME USED TO BE CALCULATED  AT
DEMURRAGE RATE PER DAY PRO RATA PLUS COST FOR ADDITIONAL BUNKERS
CONSUMED AS PER MASTERS TELEX STATEMENT.

 DEVIATION, TIME USED, BUNKERS CONSUMED AND PORT COSTS AS PER AGENTS D/A
TO BE PAID TOGETHER WITH FREIGHT AS PER OWNERS TELEXED INVOICE, WHICH
LATER TO BE SUPPORTED BY HARD COPY DOCUMENTATION

-TAXES AND OR DUES ON CARGO AND OR FREIGHT TO BE FOR CHARTERERS ACCOUNT
AND  SETTLED DIRECTLY BY THEM.

-MAX 24 HOURS AWAITING AND TRANSITING THE PANAMA CANAL TO BE FOR OWNERS
ACCOUNT  TIME IN EXCESS OF THIS TO BE FOR CHARTERERS ACCOUNT AND SETTLED
WITH FREIGHT.

-BEPPEVOY 3 C/P PLUS TRAFIGURA TERMS 1/19 AS AMENDED 02.02.01, WITH FOLL
ALTERATIONS:

-TRAFIGURA CLAUSES 1/19 AS AMENDED 02.02.01
--------------------------------------------
 1. OK

 2. OK

 3. DELETE 96 INSERT 84 HOURS SHINC

 4. DELETE 0.3 PCT AND REPLACE WITH 0.5 PCT
   DELETE IN ALL INSTANCES DEDUCT FROM FREIGHT AND REPLACE WITH CLAIM
FROM
   OWNERS

 5. DELETE

 6. DELETE SIDI KERIR AS N/A

 7. DELETE

 8. INSERT AFTER CHARTERER AT THE END OF THE FIRST SENTENCE IF REQUESTED
   DELETE (1) IN ALL CASES AND REPLACE WITH (3)

 9. OK

 10.OK

11. INSPECTIONS AND INSPECTORS BOARDING THE VESSEL ALWAYS TO BE
GOVERNED BY
    THE MASTER'S DESCISION WITH REGARD TO SAFETY AND NOT TO BE
UNREASONABLY
    WITH HELD.  PRIOR NOTICE OF ANY AND ALL INSPECTORS VISITING THE
VESSEL TO
    BE GIVEN IN WRITING AND SAME TO PROVIDE ANY AND ALL DOCUMENTATION
    REQUESTED BY THE OWNERS AND OR MASTER PRIOR TO EMBARCATION ONTO THE
    VESSEL.

12 OK

13. DISCHARGE RELOAD - PER MAIN TERMS IF AGREED.


 ANY SHIP TO SHIP OPERATIONS SHALL CONFORM TO THE STANDARDS NOT LESS
THAN THOSE SET OUT IN THE LATTEST PUBLISHED EDITION OF THE ICS/OCIMF
SHIP TO SHIP GUIDELINES AND ALWAYS BE SUBJECT TO THE MASTER'S APPROVAL.

 CHARTERER'S TO SUPPLY AND PAY FOR ALL ADEQUATE FENDERS,HOSES, EQUIPMENT
AND LOADING MASTER'S NECESSARY TO TO PERFORM TRANS  SHIPMENT OPERATIONS.

 ANY DELAY DUE TO WEATHER AND OR SEA STATE TO COUNT AS FULL LAYTIME  OR
AS DEMURRAGE RESPECTIVELY.

 IN ADDITION ANY BLENDING OR RE LOAD OR RE LOAD ON TOP FOLLOWING TO
APPLY IN  ALL CASES:

 OPERATION ALWAYS TO BE SUBJECT TO MASTERS APPROVAL WITH REGARDS TO
SAFETY OF THE VESSEL. CHARTERERS TO PROVIDE OWNERS WITH A LOI AS PER
OWNERS P AND I CLUB WORDING AND HOLD THEM HARMLESS FOR THE FACT THAT
CARGO SPECIFICATION BEFORE DISCHARGE ARE DIFFERENT FROM  THOSE AFTER
COMPLETION OF LOADING. ANY ADDITIONAL BUNKER CONSUMED  FOR CARGO
COMMINGLING TO BE FOR CHARTERERS ACCOUNT" CHTRS TO BE RESPONSIBLE FOR
ANY RISK COSTS AND EXPENSES DUE TO  ANY ADMIXTURE OF THE CARGO DUE TO
BLENDING/COMMINGLING OPERATION.

14.15 OK

16. TO READ APPON ARRIVAL AT CUSTOMARY ANCORAGE

17 OK

18.TO BE GOVERNED AND PAID FOR / SETTLED AS PER TORM INTERIM PORT CLAUSE
    ALSO OWNERS CLAUSES ABOVE TO APPLY TO THIS CLAUSE AND IN ALL CASES
OVER
    RULE CHARTERER'S CLAUSE.

19. DELETE OWNERS INSERT CHARTERER'S OR SOLE BROKER

-CHARTERER'S ADDITIONS / AMMENDMENTS TO BP CLAUSES:
-------------------------------------------------
 1. OK

 2. IN ALL INSTANCES DELETE DEDUCT FROM FREIGHT AND INSERT CLAIM FROM
OWNERS

 3. IN ADDITION TO OWNERS WEATHER CLAUSE TO APPLY

 IF DISCHARGE EC PANAMA OR EC COSTA RICA AND IF LIGHTERING/LIGHTENING/
TRANSHIPMENT TAKES PLACE AT ANY LOCATION AND/OR IF LOADING/DISCHARGING

FW: AQUIDNECK/O+O - CP DATED 13/04/06 336002

VIA A SEALINE ANY DELAYS/EXPENSES DUE TO WEATHER CONDITIONS, ADVERSE
SWELL AND OR SEA STATE TIME TO COUNT IN FULL AS LAYTIME OR DEMURRAGE
IF ON DEMURRAGE AND ANY UNBERTHING-REBERTHING COSTS TO BE FOR CHRTS
ACCOUNT. CONOCO WEATHER TO APPLY AT OTHER PORTS.

4.OK BUT DELETE 14 INSERT 21 DAYS
DELETE 13 INSERT 24

IF DISCHARGE TO BE WITH OUT PRESENTATION OF BILLS OF LADING THEN AND
LOI TO BE ISSUED IN ACCORDANCE WITH OWNERS P AND I CLUB WORDING. SAME
TO APPLY FOR ANY CHANGE OF DESTINATION.

LOI ALSO TO BE ISSUED FOR ANY CHANGE IN CARGO SPECIFICATION I.E IF
LOADING ON TOP OR COMMINGLING AS PER EARLIER CLAUSE.

5 DELETE

6 OK

- ADDITIONAL TERMS FROM CHTRS
OK HOWEVER SAME TO BE PAID TOGETHER WITH FREIGHT LEES ANY UNUSED
LAYTIME.

CLAIMS CLAUSE -
DELETE '60 DAYS' AND INSERT '90 DAYS FOR DEMURRAGE CLAIMS, 120 DAYS FOR
ALL OTHER CLAIMS'.

-OWNERS CHANGES TO BP VOY 3.
-------------------------
CLAUSE 39 INSERT PROVIDED COMPETITIVE

BP WAR RISK
-----------

WAR RISKS INSURANCE

OWNERS SHALL EFFECT WAR RISKS INSURANCE IN RESPECT OF THE HULL AND
MACHINERY OF THE VESSEL AND THEIR OTHER INTERESTS (INCLUDING, BUT NOT
LIMITED TO, LOSS OF EARNINGS AND DETENTION, THE CREW AND THEIR
PROTECTION AND INDEMNITY RISKS), AND THE GENERAL PREMIUMS AND/OR CALLS
THEREFORE SHALL BE FOR THEIR ACCOUNT.

WAR RISKS INSURANCE ADDITIONAL PREMIUMS, AND CREW WAR BONUSES, INCURRED
AS A RESULT OF THE VESSEL ENTERING AN EXCLUDED AREA ('ADDITIONAL
PREMIUM') SHALL BE FOR CHARTERER'S ACCOUNT, NET OF ALL DISCOUNTS OR
REBATES AND PROVIDED ALWAYS THAT CHARTERERS ARE GIVEN NOTICE OF THE
AMOUNT OF SUCH ADDITIONAL PREMIUM AS SOON AS POSSIBLE AND, IN ANY EVENT,
BEFORE SUCH ADDITIONAL PREMIUM IS PAID.

THE BENEFIT OF DISCOUNTS OR REBATES ON ADDITIONAL PREMIUM RECEIVED BY
OWNERS FROM THEIR WAR RISKS INSURERS, UNDERWRITERS OR BROKERS SHALL BE
CREDITED TO CHARTERERS IN FULL. CHARTERERS SHALL REIMBURSE OWNERS ANY
AMOUNTS DUE UNDER THIS CLAUSE UPON RECEIPT OF OWNERS' INVOICE TOGETHER
WITH FULL SUPPORTING DOCUMENTATION INCLUDING ALL ASSOCIATED DEBIT AND
CREDIT NOTES.

FOR THE AVOIDANCE OF DOUBT ANY 'BLOCKING AND TRAPPING', 'LOSS OF
PROFIT', 'LOSS OF HIRE', 'LOSS OF FREIGHT', OR 'LOSS OF BUNKERS'
INSURANCE TAKEN OUT BY OWNERS IN RESPECT OF THE VESSEL, AND ANY
ADDITIONAL PREMIUM RELATING THERETO ARISING FROM CHARTERERS' TRADING OF
THE VESSEL, SHALL BE FOR OWNERS' ACCOUNT.

FW: AQUIDNECK/O+O - CP DATED 13/04/06 336002

OTHERWISE ALL TERMS ABOVE TO OVER RULE BP VOY 3 WHERE CONFLICT MAY
ARISE.

END.

RGDS,
END

MANY THANKS FIXTURE

REGARDS NESTCHART


This message has been checked for all known viruses by the Cable &
Wireless Email protection service, powered by Message Labs.

# TRAFIGURA CHARTERING CLAUSES

(amended 02.02.01)

## TRAFIGURA SHIPPING ADDITIONAL CHARTERING CLAUSES
(1st January 1991)

### 1. Confidentiality Clause :
All negotiations and details resulting in this fixture to be kept
strictly private and confidential.

### 2. Base Charter Clause :
Charter party to be based on Beepeevoy 3 Form (Britannic Tower),
deleting any reference to BP Shipping Ltd where applicable and replacing
with Trafigura Beheer BV Amsterdam, Lucerne Branch Office.

### 3. Worldscale / Laytime Clause :
Worldscale terms and conditions to apply.  96 hours allowed laytime.

### 4. IN-TRANSIT LOSS CLAUSE :
In addition to any other rights which Charterers may have, Owners will
be responsible for the full  amount of any in-transit loss if in-transit
loss exceeds 0.3% and Charterers shall have the right to deduct from freight
an amount equal to the FOB port of loading value of such lost cargo plus
freight and insurance due with respect thereto. In-transit loss is defined
as the difference between net vessel volumes after loading at the loading
port and before unloading at the discharge port.

### 5. ADDRESS COMMISSION CLAUSE :
2.5 per cent is payable by Owners to Charterers on all monies paid.
Such address commission is deductible at source.

file://C:\Documents and Settings\gutowski\Local Settings\Temporary Internet Files\OLK5...    9/13/2007

Trafigura clauses dated 2/2/01

## 6. SIDI-KERIR LOADING - VOYAGE ORDERS CLAUSE: (Where applicable)

The following should be included in the voyage orders for vessels
loading at Sidi Kerir or discharging at Ain Sukhna:

**A)**    ETA notices to be sent to Sumed immediately upon sailing from
previous port then at 72, 48 and 24 hours prior to arrival, plus immediate
notification of any change in ETA of more than 6 hours either:

By cable to "Sumed, Alexandria". The cable to be prefixed "to be
conveyed via telex (54108 or 54033 SUMED UN). To operations office - oil
movement, attention Mr. S. El-Rabat", or

Direct by telex on number 54108 or 54033 SUMED UN addressed to
operations office - oil movement attention Mr. S. El-Rabat.

In addition to the above, Master should contact SUMED on VHF 2182
khz twenty four hours prior to arrival to confirm ETA. Masters are also
required to contact the terminal on VHF channel 16 (or preferably channels
78 and 79 if available) six hours prior to arrival.

**B.**    At the time that first ETA is provided Master should also advise
amount of ballast to be discharged. This is most important. In this
respect please note following instructions regarding ballast:

Any ballast, clean or dirty, contained in vessel's cargo tanks
upon arrival at Sidi Kerir, must be discharged at shore deballasting
facilities, and will be charged to Owners' account at the usual deballasting
fee of 20 cents/mt.

Should vessel's Master advise that cargo tanks contain clean
ballast, SUMED can arrange for an analysis at Master's request, with all
costs for account of Owners, and if result shows that ballast will not
pollute the sea, they will allow vessel to discharge water into the sea.

Ballast water will be considered clean only in the following cases:

    A.  To be contained in segregated tanks,
    B.  If ballast is in the cargo tanks that has been crude oil washed in
the previous discharge and water washed during the ballast leg. as per
MARPOL regulations any other form of ballast will be considered dirty
ballast.

## 7. KHARG ISLAND LOADING CLAUSE : (Where applicable)

Should any discrepancies arise regarding Bill of Lading figures,
Charterers' representative will liaise with the Master to ascertain exact quantity on board and issue an
ullage report accordingly.

Further, Charterers' representative is authorised to sign a letter confirming the
actual quantity on board and freight will be payable on this figure, or Bill
of Lading whichever is greater.

Should it be deemed necessary, Charterers' representative is authorised
to sign any/all documents such as obq/slops/ullage reports in place of
suppliers.

## 8. OIL POLLUTION CLAUSE :
Owners warrant that they have valid cover for pollution of
USD 1 billion with their P and I Club and that this cover will remain in
place throughout this Charter.

Owners shall confirm to Charterers within one (1) business day after
the fixture is concluded, written evidence from the vessel's P and I
Club/responsible insurance broker of P and I Pollution cover of
USD 1 billion and that such cover will be in effect during the entire
period of the Charter.  The vessel's P and I Club/responsible insurance
broker must be acceptable to Charterers.  If not acceptable to Charterers
or if written evidence is not received by Charterers within the one (1)
business day, Charterers shall have the right to cancel said fixture within
one (1) business day from the day the Owner is required to present to
Charterers verification of such pollution coverage.

## 9. DRUG AND ALCOHOL CLAUSE :
Owner warrants that it has a policy of Drug and Alcohol Abuse
("Policy") applicable to the vessel which meets or exceeds that standards
in the Oil Companies International Marine Forum Guidelines for the control
of drugs and alcohol on board ship ("OCIMF Guidelines").  Owner further
warrants that this policy will remain in effect during the term of this
Charter, and that Owner shall exercise due diligence to ensure that the
policy is complied with.  For the purposes of the Clause and the OCIMF
Guidelines, alcohol impairment shall be defined as a blood alcohol content
of 40 mg/100 ml or greater; the appropriate seafarers to be tested shall
be all vessel officers and the drug/alcohol testing and screening shall
include random testing of the officers with a frequency to ensure that each
officer is tested at least once a year.

Owners further warrant that full declaration has been onpassed to
Exxon/Exxon affiliate which as above states that vessel operates under a
Drug and Alcohol Policy which meets or exceeds the OCIMF Guidelines.

## 10. LAW/ARBITRATION CLAUSE :
Good and proper service of proceedings can be made by ordinary mail on
Owners at (please insert address), and on Charterers at C/O Trafigura Ltd,
17 Connaught Place London W2 2EL

Notwithstanding Clause 55, either party may, by giving written notice
of election to the other party, elect to have any disputes arising under
this Charter referred to arbitration in London according to English Law
consisting of one arbitrator to be appointed by the Owner, one by the
Charterer, and one by the two so chosen.  The decision of any two of the
three on any point or points shall be final.  Until such time as the
arbitrators finally close the hearings either party shall have the right by
written notice served on the arbitrators and on an officer of the other

party to specify further disputes or differences under this Charter for
hearing and determination.

### 11. Inspection Clause :
Charterers shall always have the right to place on board an Independent
Inspector at both load and discharge port.

Such Inspector in addition to normal inspection practices, shall always
have the right to ullage, inspect by any means whatsoever, and sample
vessel's bunker tanks as well as vessel's void spaces and other tanks whatsoever.

Charterers shall always be allowed to inspect any or all of the vessel's records
and/or other documents on board which said Inspector deems to be relevant,
including provision of bunkers, and/or to the carriage of the cargo.

### 12. Eligibility Clause :
Owners warrant that the vessel is completely free to trade within IWL and is
not in any way listed as unacceptable by any Major Oil Company, Government
or other organisation whatsoever, nor is she debarred by any activity of any
port within load or discharge areas within agreed ranges.

### 13. Reloading Clause :
Charterers shall have the option of reloading the vessel with a part
cargo at any port of discharge nominated by the Charterers within the
discharge option contained in Clause 3 of Beepeevoy 3, and Owner agrees
to discharge such reloaded cargo at any other discharge port or ports
previously nominated provided such port or ports, lie within the rotation
of discharge ports previously nominated.

If this option is exercised, freight shall be payable at the demurrage rate stipulated
in Clause 22 for additional time consumed awaiting berth and/or cargo and/or tank preparation and/or
loading and discharging such cargo, and any additional

charges incurred as a result of such reloading shall be for Charterers account.

### 14. ITOPF Clause :
Owners undertake that the vessel:
Is a tanker owned by a member of the International Tanker Owners Pollution
Federation Ltd. and will remain so throughout the Charter Period

Owners warrant that the vessel will only be entered in a P&I within the
International Group of P&I Club acceptable to Trafigura.

### 15. ISM COMPLIANCE Clause:
Owners undertake that from the date of coming into foerce of the
International Management Code for the Safe Operation of Ships and for
Pollution Prevention (The International Safety Management (ISM) Code) (the
'ISM Code') on the 1 of July 1998, and for the duration of the Charter, the
vessel and 'the Company' (as defined in the ISM Code) shall comply with the
requirements of the ISM Code. The Charterers require relevant document of

Compliance and/or Safety Management Certificate. If the relevant documents
are not received by Charterers within one (1) business day of fixture, they
shall have the right to cancel fixture.

Without prejudice to any rights or remedies available to the Charterers
under the terms of this Charter or under English Law. In the event of a
breach of the above undertaking any loss, damage, expense or delay following
therefrom shall be for Owners' account.

## 16. NOR CLAUSE :
NOR to be tendered when vessel is anchored at customary anchorage.

## 17. INTERIM VOYAGE CLAUSE :
From  position given when fixing, vessel will not perform any interim voyage.
Vessels schedule to be provided accordingly.
## 18. INTERIM PORT CLAUSE :
Charterers have option to load and/or discharge and/or blend and/or reload part or full cargo at one or
more safe port(s) or STS.

Location(s) after first load port charterers shall settle all port/STS costs including agency fees directly
and shall reimburse owners for all additional time used for deviation and in port (weather permitting or
not) at demurrage rate plus bunkers consumed plus any additional expenses incurred as part of the
freight payment as per owners telexed invoice with supporting docs to follow if requested by charterers.
However charterers to be allowed full benefit of unused laytime for calculation of time in port under
above clause. Charterers shall have the benefit of 6 hours allowance for nor.

## 19. CP ADMINISTRATION CLAUSE :

**A)**    Unless otherwise specifically requested by either owners or charterers,
No formal charterparty shall be prepared and signed. The terms and

Conditions of this charter shall be evidenced by a recap fixture
telex/email.
"Recap fixture telex/e-mail" issued by charterers broker to owners and
charterers and shall be confirmed as correct by return telexes/e-mails from
both parties to the said broker who shall acknowledge receipt of such
confirmation to both parties within forty-eight (48) hours after the lifting
of subjects and a charterparty in the format of this charter, as modified by
the recap fixture telex/e-mail and bearing the same date as the recap
fixture telex/e-mail, shall be deemed to have signed by owners and
charterers.

**B)**    If either party requires a formal charterparty to be prepared and signed then owners
shall procure that owners broker shall prepare a charterparty in the format of this charter,
as modified by the recap fixture telex/e-mail, and bearing the same date as the recap
fixture telex/e-mail and shall arrange for signature thereof by both owners

And charterers.

Trafigura clauses dated 2/2/01

## AMENDMENTS TO BEEPEEVOY 3

1.  **Clause 7:**    **Line 150** from "Clause 8" insert "4 and 5 of Trafigura

    Shipping Clauses 1991". Delete "54".

2.  **Clause 8:**    **Line 158** after "vessel's pumps" insert "provided Master has
    ensured correct trim procedure to maximise cargo outturn".

3.  **Clause 21:**    **Line 303** after "peoples" insert "or any other cause".

4.  **Clause 36:**    **Line 459** delete from "upon" until "Master" in line 459.

    **Line 477**: After "Law" insert "Owners to return to
    Charterers 2/3 original Bills of Lading, together with
    Owners' receipt for 1/3 original Bill of Lading within 14
    days from receipt". LOI

    to become null and void upon presentation of b/l or 13
    months after issuance whichever occurs first.

5.  **Clause 46:**    **Line 559** after "peoples" insert "or any cause beyond
    Charterers' control".

6.  **Clause 53:**    to read 'Owners warrant that they are members of ITOPF and
    will remain so during the duration of the voyage'

END +++++++++++++

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *
This email and any attachments are confidential and access
to this email or attachment by anyone other than the addressee
is unauthorised. If you are not the intended recipient please
notify the sender and delete the email including any attachments.

You must not disclose or distribute any of the contents to any
other person. Personal views or opinions are solely those of the
author and not of Trafigura. Trafigura does not guarantee that
the integrity of this communication has been maintained nor
that the communication is free of viruses, interceptions or
interference. By communicating with anyone at Trafigura by
email, you consent to the monitoring or interception of such
email by Trafigura in accordance with its internal policies.
Unless otherwise stated, any pricing information given in this
message is indicative only, is subject to change and does not

Trafigura clauses dated 2/2/01

constitute an offer to deal at any price quoted.



**BP SHIPPING LTD.**
Britannic Tower
Moor Lane
LONDON·EC2Y 9BU

Code word for this Charterparty
"BEEPEEVOY 3"

# *Voyage Charterparty*

| | |
|---|---|
| LONDON................................................................19.............. | 1 |
| *It is this day agreed between*...................................................................................... | 2 |
| of................................................................................................................................ | 3 |
| ...................................................................................................................................... | 4 |
| Owners (hereinafter referred to as 'Owners') of the good motor/steam tank vessel called | 5 |
| ...................................................................................................................................... | 6 |
| (hereinafter referred to as 'the Vessel') now...................................................................... | 7 |
| ......................................................and expected ready to load about ............................ | 8 |
| and *BP Shipping Limited*  of London as agents for.......................................................... | 9 |
| ...................................................................................................................................... | 10 |
| (hereinafter referred to as 'Charterers') | 11 |

**Classification of Vessel**

1.     Owners undertake that:

| | |
|---|---|
| (a) the Vessel is classed................................................................................................ | 13 |

**Description of Vessel**

| | |
|---|---|
| (b) the Vessel has a summer deadweight of.........................................................tonnes | 14 |
| on a saltwater draught of.........................................metres, with a total cargo capacity (98% | 15 |
| full) of.......................................cubic metres; | 16 |
| (c) the Vessel is fully fitted with heating coils fabricated from.................................... | 17 |
| in all cargo tanks, capable of heating the cargo to, and maintaining it at all times at a temperature of, | 18 |
| 57deg C (135deg F); | 19 |
| (d) the Vessel is equipped with derricks capable of lifting to, and supporting at, the Vessel's port and | 20 |
| starboard manifolds submarine hoses of up to....................tonnes in weight. | 21 |

**Condition of Vessel**

2.     Owners shall before, at the commencement of, and throughout the voyage exercise due diligence to make and maintain the Vessel, her tanks, pumps, valves and pipelines tight, staunch, strong, in good order and condition, in every way fit for the voyage and fit to carry the cargo provided for in Clause 3, with the Vessel's machinery, boilers and hull in a fully efficient state, and with a full and efficient complement of Master, officers and crew.

| | |
|---|---|
| | 22 |
| | 23 |
| | 24 |
| | 25 |
| | 26 |

| | | |
|---|---|---|
| Loading and Discharge Ports Range | 3.   Subject to the provisions of Clause 24, the Vessel shall proceed to........................................................ | 27 |
| | ................................................................................................................................................................ | 28 |
| | ................................................................................................................................................................ | 29 |
| | ................................................................................................................................................................ | 30 |
| Cargo | or so near thereunto as she may safely reach, and there load a cargo of............................................... | 31 |
| | ................................................................................................................................................................ | 32 |
| | ................................................................................................................................................................ | 33 |
| | ................................................................................................................................................................ | 34 |
| | ................................................................................................................................................................ | 35 |
| | ................................................................................................................................................................ | 36 |

...................................................................................................................in bulk, not exceeding what she can reasonably stow and carry over and above the tackle, provisions and furniture, and in any case not in excess of the quantity permitted by the International Load Line Convention, 1966, or any modification or amendment thereof as may be applicable to the voyage to be performed under this Charter. Thereupon the Vessel shall proceed with such cargo at a speed which Owners undertake shall be ...........................................knots ('Base Speed'), as ordered on signing Bills of Lading or as provided in Clauses 24 and/or 26  to...........................................................................................................................................

| | | |
|---|---|---|
| | | 37 |
| | | 38 |
| | | 39 |
| | | 40 |
| | | 41 |
| | | 42 |
| | | 43 |
| | ................................................................................................................................................................ | 44 |
| | ................................................................................................................................................................ | 45 |
| | ................................................................................................................................................................ | 46 |
| | ................................................................................................................................................................ | 47 |
| | ................................................................................................................................................................ | 48 |

...........................................................................................................or so near thereunto as she may safely reach, and deliver the same in consideration of the payment of freight as provided in Clauses 6 and 7.

Charterers shall have the right at any time during the voyage to order the Vessel to increase speed in order to arrive at a port or place on a certain date. Charterers shall not instruct the Vessel to increase speed such as to require the Vessel to proceed at a maximum speed in excess of that set out in the BP Shipping Questionnaire. If Charterers require any increase of speed to be made, any increase in the freight rate consequent thereon shall be calculated in accordance with the provisions of Clause 6.

If the Vessel fails to maintain Base Speed, or fails to comply with instructions as to the increase of speed given by Charterers pursuant to this Clause, Owners shall, subject to Clause 46, be liable for all costs, losses, damages and expenses arising as a direct consequence thereof save to the extent that Owners can prove to the satisfaction of Charterers that such failure was attributable to a reduction in speed necessitated by either adverse weather and sea state conditions or the safe navigation of the Vessel and Charterers shall be entitled to deduct any such costs, losses, damages and expenses from any demurrage due to Owners hereunder without prejudice to any other rights available to Charterers under this Charter or otherwise under English Law.

| | | |
|---|---|---|
| Loading/ Discharge Place | 4.   The Vessel shall be loaded and discharged at any port, berth, dock, anchorage, submarine line, single point or single berth mooring facility, offshore location, alongside vessels or lighters, or any other place whatsoever as ordered by Charterers. Charterers shall exercise due diligence before directing the Vessel to any such places to ascertain that the Vessel can always lie safely afloat, but Charterers do not warrant the safety of any of the aforementioned places and shall be under no liability in respect thereof except for loss or damage caused by the failure to exercise due diligence as aforesaid. | 64 65 66 67 68 69 |

51
52
53
54
55

56
57
58
59
60
61
62
63

49
50

| | | |
|---|---|---|
| Lightening at Sea | If a port is nominated which cannot accommodate the Vessel with the quantity of cargo carried, Charterers undertake to discharge sufficient cargo at a previous port or place, or into vessels or lighters, to enable the Vessel to enter and lie at such nominated port or place. Freight shall be paid in accordance with Clause 6 and lighterage shall be at the expense of Charterers. | 70 71 72 73 |
| | A place of lightening at sea shall not constitute a discharge port or place under Clause 19, but all time used for a lightening operation (excluding any time lost or spent by reason of any of the causes stipulated in Clauses 20 and 21) shall count against the number of running hours stipulated in Clause 18 for the purpose of calculating Charterers' liability, if any, for demurrage as provided in Clause 22. For the purpose of this Clause the lightening operation shall be deemed to commence when the Vessel is properly tied up and moored alongside the lightening vessel and to end when unmooring has been completed. | 74 75 76 77 78 79 |
| | Subject to the preceding paragraph of this Clause, any additional steaming and/or waiting time used solely by reason of Charterers' orders to lighten at sea shall count as laytime or, if the Vessel is on demurrage, as demurrage. | 80 81 82 |
| Ship to Ship Transfer Operations | If Charterers require the Vessel to trans-ship cargo from or into another ocean going vessel the trans-shipment operation shall be carried out in accordance with the recommendations set out in the latest edition of the ICS/OCIMF Ship to Ship Transfer Guide (Petroleum) and Owners undertake that the Vessel and her crew will comply with such recommendations. Charterers shall provide and pay for all necessary equipment including suitable fenders and hoses. Owners shall permit supervisory personnel nominated by Charterers to attend on board, including a Mooring Master, to assist in the trans-shipment operation. In the case of a ship to ship transfer freight shall be paid in accordance with the provisions of Clause 6. | 83 84 85 86 87 88 89 |
| | No provision herein contained as to laytime and demurrage shall be affected by the provisions of Clause 46. | 90 |
| Shifting | 5. Charterers may require the Vessel to load at more than one berth at each loading port or place and to discharge at more than one berth at each discharge port or place in which event Owners shall, in the first instance, pay expenses arising from any of the following movements of the Vessel:- | 91 92 93 |
| | (a) unmooring at, and pilotage and towage off, the first loading or discharge berth; | 94 |
| | (b) mooring and unmooring at, and pilotage and towage on to and off, the intermediate loading or discharge berths; and | 95 96 |
| | (c) mooring at, and pilotage and towage on to, the last loading or discharge berth. | 97 |
| | Charterers shall reimburse Owners in respect of expenses properly incurred arising from any of the afore-mentioned movements upon presentation by Owners of all supporting invoices evidencing prior payment by Owners. | 98 99 100 |
| | Charterers shall reimburse Owners in respect of any dues and/or other charges incurred in excess of those which would have been incurred if all the cargo involved at the particular port or place had been loaded or discharged at the first berth only. Time consumed on account of shifting shall count as laytime or, if the Vessel is on demurrage, as demurrage, except as otherwise provided in Clause 20. | 101 102 103 104 |
| Port and Terminal Combinations | For the purpose of freight payment, the places grouped in Port and Terminal Combinations in the New Worldwide Tanker Nominal Freight Scale (hereinafter referred to as ' Worldscale'), as amended at the date of this Charter, shall be considered as berths within a single port, Charterers reimbursing shifting expenses in accordance with the foregoing provisions. | 105 106 107 108 |
| Rate of Freight | 6. The rate of Freight shall be at the level of............................................................................................... | 109 |
| | .............................................................................................................................................................................. | 110 |
| | .............................................................................................................................................................................. | 111 |
| | .............................................................................................................................................................................. | 112 |
| | .............................................................................................................................................................................. | 113 |
| | .............................................................................................................................................................................. | 114 |
| | ...................................................................................................................% of the rate for the voyage | 115 |
| | as provided in Worldscale, as amended at the date of this Charter. If Charterers order the Vessel to | 116 |

increase speed under the provisions of Clause 3 such rate shall be increased by.............................. 1!
Worldscale points for each knot of increased speed above the Base Speed or on a pro rata basis for fractions 1.
of a knot up to a maximum of....................................knots. Such increase shall be calculated in accordance 1:
with the following example:            -            - 12

> Example: The Vessel proceeds at Base Speed of 10 knots, the rate for which is Worldscale 40. 1⁷
> After 10 days the Vessel is ordered to complete the voyage at 12 knots. The remainder of the 12
> voyage takes 20 days. The increased speed option provides for a premium of 0.5 of a Worldscale 12
> point per knot of increased speed over Base Speed. 12

> The freight rate for the above voyage would be calculated as follows: 12
> Voyage Freight Rate = (W40 x 10 days) + (W41* x 20 days) 1:.
> $\qquad\qquad\qquad\qquad$ 30 (total voyage days) 12
> $\qquad\qquad$ = W40.67 . 12
> (*1 point premium for 12 knots maximum speed) 12⁺

Should the Vessel not maintain the speed ordered, due to breakdown or any other reason whatsoever 13⁶
beyond Charterers' control, the freight rate shall be calculated based on the average speed actually 13
achieved by the Vessel using BP Worldwide Marine Distance Tables to assess the length of the voyage 13⁷
between pilot stations at the loading and discharge ports or places.    . 13⁷

If the Vessel is ordered to lighten pursuant to Clause 4, the freight rate shall, notwithstanding the 12⁴
lightening, be the same Worldscale rate for the voyage as would be payable if no such lightening had taken 135
place. 13⁶

In the case of a ship to ship transfer, as referred to in Clause 4, the freight rate for the voyage shall be the 13⁷
rate as provided in Worldscale for the relevant Trans-shipment Area, as amended at the date of this 13⁸
Charter, or as provided by Worldscale upon application by the parties or either of them. 13⁹

Notwithstanding the provisions of Clause 3 and the provisions of this Clause should the Vessel load in 14⁶
excess of the quantity specified therein then the freight payable for any overage in excess of such quantity 141
shall be at one half of the freight rate(s) referred to above. 142

**Payment of Freight**     7.    Freight shall be payable immediately after completion of discharge, on the gross quantity of cargo 143
loaded by the Vessel as evidenced by the Bills of Lading furnished by the shippers. Payment shall be made 144
in U.S. dollars  . 145

to............................................................................................................................................................................ 146

........................................................................................................................................................................... 147

........................................................................................................................................................................... 148

...................................................................................................................................................................less 149
any sum derived from the operation of Clauses 8 and 54 and less any disbursements or advances made to 150
the Master or agents at ports of loading and/or discharge, and additional cargo insurance premium for 151
Owners' account under Clause 42, provided that no freight shall be payable on any quantity which 152
submerges, at any stage of the voyage, the marks appropriate under the International Load Line 153
Convention, 1966, or any modification or amendment thereof as may be applicable to the voyage to be 154
performed under this Charter. 155

**Cargo Retention**     8.    If any material remains in the Vessel's cargo tanks on completion of discharge of cargo Charterers 156
shall be entitled to appoint an independent surveyor to determine what, if any, quantity of such material is 157
cargo which is liquid, pumpable and reachable by the Vessel's pumps. The independent surveyor's findings 158
shall be final and binding on Owners and Charterers. Charterers shall be entitled to deduct from freight an 159
amount equal to the FOB port of loading value of any quantity so determined together with freight due with 160
respect thereto. Charterers hereby agree to indemnify Owners against any liability to a Bill of Lading 161
holder resulting from non-delivery of any such cargo in respect of which a deduction from freight is made 162
provided, however, that Charterers shall in no event be liable to indemnify Owners in an amount greater 163
than the amount of the deduction from freight. 164

**Cleaning of Vessel's Tanks, Pumps and Pipelines**     9.    Without prejudice to the provisions of Clause 2 Owners shall use due diligence to ensure that the 165
Vessel presents for loading with her tanks, pumps and pipelines properly cleaned to the satisfaction of any 166
inspector appointed by Charterers and ready for loading the cargo specified in Clause 3. Any time used in 167
cleaning tanks, pumps and pipelines to Charterers' inspector's satisfaction shall not count as laytime or 168
demurrage and shall, together with any costs incurred in the foregoing operations, be for Owners' account. 169

| | | |
|---|---|---|
| Arriving to Even Keel | 10.  If for any reason the Vessel is unable to trim to even keel for arrival at a discharge port Owners shall notify Charterers by radio or telex stating the Vessel's expected arrival draught forward and aft in salt water. Such notification shall be given as soon as practicable after the receipt of loading orders and no later than sailing from the loading port or place. | 170<br>171<br>172<br>173 |
| Slack Tanks | 11.  Notwithstanding the provisions of Clause 7, if Charterers are unable to supply the quantity of cargo specified in Clause 3 the Vessel shall not be required to proceed to sea until such of her tanks are filled as will place her in a seaworthy condition, and freight shall be paid as if the Vessel had been loaded with the quantity of cargo specified in Clause 3. | 174<br>175<br>176<br>177 |
| Inert Gas System | 12.  Owners undertake that the Vessel is equipped with a fully functional Inert Gas System which is in use on the date hereof and shall so remain during the period of this Charter and that the officers and crew are properly qualified by way of certification for, and experienced in, the operation of such System. Owners further undertake that the Vessel shall arrive at the loading port with her cargo tanks inerted and that such tanks shall remain inerted throughout the voyage and the subsequent discharge of the cargo. Any time lost, whether or not the Vessel is on demurrage, owing to deficient or improper operation of the Inert Gas System shall be for Owners' account. | 178<br>179<br>180<br>181<br>182<br>183<br>184 |
| | The Vessel's Inert Gas System shall fully comply with Regulation 62, Chapter II-2 of the SOLAS Convention 1974 as modified by its Protocol of 1978 and Owners undertake that such System shall be operated by the officers and crew in accordance with the operational procedures set out in the IMO publication entitled 'Inert Gas Systems 1983' as may, from time to time, be amended. | 185<br>186<br>187<br>188 |
| | If Charterers so require, Owners shall arrange for the Vessel's tanks to be de-inerted to facilitate inspection, gauging and sampling. Any time taken in de-inerting, inspecting, gauging, sampling and re-inerting thereafter shall count as laytime or, if the Vessel is on demurrage, as demurrage. | 189<br>190<br>191 |
| Crude Oil Washing - Crude Oil Vessels | 13.  Owners undertake that the Vessel is equipped with a fully functional Crude Oil Washing System and that the officers and crew are properly qualified by way of certification for, and experienced in, the operation of such System. | 192<br>193<br>194 |
| | Whilst Charterers may instruct the Master to carry out crude oil washing of all tanks which contained cargo the Master shall, in any event, arrange for the crude oil washing of cargo tanks to the MARPOL minimum standards, as set out in the Vessel's Crude Oil Washing Operation and Equipment Manual, at the discharge port or place. | 195<br>196<br>197<br>198 |
| | For all such crude oil washing the period for discharge specified in Clause 16 shall be increased from 24 to 30 hours or pro rata thereof in the case of a part cargo. Any additional time taken for discharge and crude oil washing shall not count as laytime or, if the Vessel is on demurrage, as demurrage. | 199<br>200<br>201 |
| Dues and Other Charges | 14.  Dues and other charges levied upon the Vessel, howsoever assessed, shall be paid by Owners. Dues and other charges upon the cargo shall be paid by Charterers. | 202<br>203 |
| | Notwithstanding the foregoing where, under the provisions of Worldscale, as amended at the date of this Charter, a due or charge is expressly for the account of Owners or Charterers then such due or charge shall be paid in accordance with such provisions. | 204<br>205<br>206 |
| | Should a charge be imposed upon Charterers by the owner of a berth by reason of prolonged occupation of such berth by the Vessel for reasons beyond the control of Charterers or their agents such charge shall be paid by Owners. | 207<br>208<br>209 |
| Loading and Discharge of Cargo | 15.  The cargo shall be pumped into the Vessel at the expense of and at the risk and peril of Charterers as far as the Vessel's manifold only, and pumped out of the Vessel at the expense of and at the risk and peril of Owners as far as the Vessel's manifold only. | 210<br>211<br>212 |
| | Owners shall, if requested, make available the hands, equipment, and facilities required on board for the connecting and disconnecting of hoses for loading and discharging. The Master may demand shore supervision of, and approval for, the connecting and disconnecting of hoses. Any delay resulting from the failure by Owners to provide the hands, equipment and facilities as aforesaid shall not count as laytime or, if the Vessel is on demurrage, as demurrage. | 213<br>214<br>215<br>216<br>217 |
| Pumping | 16.  Owners undertake that the Vessel shall discharge a full cargo, as defined hereunder, within 24 hours, or pro rata thereof in respect of a part cargo, from the commencement of pumping or that the Vessel shall maintain a minimum discharge pressure of 100 psig at the Vessel's manifold throughout the period of discharge provided that the shore receiving facilities are capable of accepting discharge of the cargo within such time or at such pressure. The shore receiving facilities shall have the right to gauge discharge pressure | 218<br>219<br>220<br>221<br>222 |

at the Vessel's manifold. 223

Any additional time used owing to the inability of the Vessel to discharge the cargo within 24 hours or 30 224
hours, as the case may be, or such shorter period as may be applicable in the case of a part cargo, or to 225
maintain a minimum discharge pressure of 100 psig at the Vessel's manifold throughout the discharge shall 226
be for Owners' account and shall not count as laytime or, if the Vessel is on demurrage, as demurrage. If 227
the shore receiving terminal facilities are unable to accept discharge of the cargo within the aforemen- 228
tioned time or at the aforementioned discharge pressure the Master shall present the shore receiving 229
terminal with a Note of Protest forthwith, and in any event prior to the Vessel's departure from the berth, 230
and shall use all reasonable endeavours to have such Note of Protest countersigned on behalf of the shore 231
receiving terminal in the absence of which countersignature the Master shall present a further Note of 232
Protest to the shore receiving terminal. 233

For the purpose of this Clause a full cargo shall mean the quantity referred to in Clause 3 or the Bill of 234
Lading quantity, whichever is the greater. 235

Charterers will not consider any claim by Owners for additional time used in the foregoing circumstances 236
in the absence of the provision by Owners of the following documentation:- 237

(a) an hourly pumping log, signed by a responsible officer of the Vessel and a terminal or Charterers' 238
representative, showing the pressure maintained at the manifold throughout discharge and, in the absence 239
of a signature from a terminal or Charterers' representative, a Note of Protest; 240

(b) copies of all Notes of Protest issued or received by the Vessel in relation to the discharge in question; and 241

(c) copies of any other documentation generated by the Vessel or by the shore receiving terminal relevant 242
to the discharge in question. 243

**Laydays/**
**Cancelling**
17.  Laydays for the purpose of this Charter shall be from ............................................................................... 244

("the Commencement Date") to..............................................................................("the Cancelling 245
Date"). Laytime for the purposes of loading shall not commence before 0600 hours local time on the Com- 246
mencement Date unless with Charterers' sanction in which event laytime shall commence when the Vessel 247
commenced loading and should the Vessel not be ready to load by 1600 hours local time on the Cancelling 248
Date Charterers shall have the option of cancelling this Charter. Should the Vessel, with Charterers' 249
sanction, have commenced loading prior to the commencement of laytime, as provided above, then the time 250
from such commencement of loading to the commencement of laytime shall constitute additional laytime 251
for the purpose of loading and discharging and in respect of the period(s) referred to in Clause 18. 252

If it appears to Charterers that the Vessel will be delayed beyond the Cancelling Date Charterers may 253
require Owners to notify Charterers of the date on which they expect the Vessel to be ready to load 254
whereupon Charterers shall have the option to cancel this Charter and such option shall then be declared 255
by Charterers within 96 hours, Sundays and holidays excepted, of the receipt of the said notification from 256
Owners. In the event of Owners giving such notification and Charterers not exercising their option to 257
cancel within the stated period, the third day after the readiness date stated in Owners' notification, or 258
such other date as may be mutually agreed, shall be the new Cancelling Date for the purpose of this Clause. 259
If Owners fail to give such notification when requested by Charterers, Charterers shall have the option to 260
cancel this Charter at any time prior to the arrival of the Vessel. 261

Cancellation or failure to cancel shall be entirely without prejudice to any claim for damages Charterers 262
may have for the Vessel not being ready to load by the original Cancelling Date stated in this Clause. 263

**Amount of, and**
**Definition of,**
**Laytime**
18.  Charterers shall be allowed.................................hours, together with any period of additional 264
laytime arising under the provisions of Clause 17 if Charterers sanction loading of the Vessel before the 265
commencement of laydays, as laytime for loading and discharging and in respect of any period(s) when the 266
Vessel, in accordance with Charterers' instructions, is proceeding or operating as referred to in Clauses 4, 267
5, 12, 21, 24, 25, 26, 29, 30 and 31. Sundays and holidays shall be included in respect of laytime for loading 268
or discharging unless loading or discharging on the Sunday or holiday in question is prohibited by law or 269
regulation at the port or place of loading or discharge and Charterers shall have the right of loading and 270
discharging during the night. 271

**Commencement**
**and Termination**
**of Laytime/**
**Demurrage**
**for Loading**
**and Discharge**
19.  Subject only to Clauses 17, 20 and 21:- 272

(a) laytime or, if the Vessel is on demurrage, demurrage shall at each loading and each discharge port or 273
place commence at the expiry of 6 hours after Notice of Readiness to load or discharge has been received 274

from the Master or his agents by Charterers or their agents, berth or no berth, or when the Vessel commences to load or discharge at the berth or other loading or discharging place, whichever first occurs. Such Notice of Readiness may be given either by letter, facsimile transmission, telegram, telex, radio or telephone (but if given by radio or telephone shall subsequently be confirmed in writing and if given by facsimile transmission confirmed by telex) but Notice of Readiness shall not be given, without Charterers' sanction, before the commencement of laydays; and | 275 276 277 278 279 280

(b) laytime or, if the Vessel is on demurrage, demurrage shall run until the cargo hoses have been finally disconnected upon termination of loading or discharging, such disconnection to be effected promptly; provided always that if the Vessel is detained for more than 2 hours beyond the final disconnection of hoses by the shore terminal solely for the completion of cargo documentation and the presentation of such documents on board the Vessel, laytime or, if the Vessel is on demurrage, demurrage shall re-commence after such period of 2 hours and terminate upon the completion of cargo documentation. | 281 282 283 284 285 286

**Suspension of Laytime/ Demurrage for Loading and Discharge**     20.   Time shall not count against laytime or, if the Vessel is on demurrage, for demurrage when spent or lost:- | 287 288

(a) on an inward passage, including awaiting daylight, tide, opening of locks, pilot, or tugs and moving from anchorage, even if lightening has taken place at the anchorage, until the Vessel is securely moored at the berth or other loading or discharging place specified by Charterers; | 289 290 291

(b) due, whether directly or indirectly, to breakdown, inefficiency or other cause attributable to the Vessel and/or Owners, including inability of the Vessel to pump out the cargo at the rate indicated in Clause 16 after taking account of any variations in back pressure; | 292 293 294

(c) as a result of a labour dispute, or strike, involving Master, officers or crew of the Vessel or tugs or pilot; | 295

(d) in, or in connection with, the handling of ballast unless this is carried out concurrently with loading or discharging such that no loss of time is involved; and | 296 297

(e) in cleaning tanks, pumps and pipelines. | 298

Nothing herein contained shall be affected by the provisions of Clause 46. | 299

**Laytime/ Demurrage/ Force Majeure**     21.   Any delay(s) arising from adverse weather or sea state conditions, fire, explosion, breakdown or failure of equipment, plant or machinery in or about ports or places of loading and/or discharge, Act of God, act of war, labour dispute, strike, riot, civil commotion, or arrest or restraint of princes, rulers or peoples shall, provided always that the cause of the delay(s) was not within the reasonable control of Charterers or Owners or their respective servants or agents, count as one half laytime or, if the Vessel is on demurrage, at one half of the demurrage rate. | 300 301 302 303 304 305

**Demurrage**     22.   Charterers shall pay demurrage at the rate of US$.................................per running day and pro rata for part of a running day for all time that loading and discharging and any other time counting as laytime exceeds the laytime specified in Clause 18. | 306 307 308

**Demurrage Time Bar**     23.   Charterers shall be discharged and released from all liability in respect of any claim for demurrage which Owners may have under this Charter unless a claim in writing has been presented to Charterers together with supporting documentation substantiating each and every constituent part of the claim within 90 days of the completion of discharge of the cargo carried hereunder. | 309 310 311 312

**Orders for Discharge Ports or Places**     24.   If, at any time after the Vessel has completed loading the cargo or part cargo, as the case may be, Charterers instruct the Vessel to await their orders at one or more locations, then all time spent by the Vessel awaiting orders as aforesaid shall count as laytime or, if the Vessel is on demurrage, as demurrage. | 313 314 315

**Revised Orders**     If after any loading or discharge port or place has been nominated Charterers desire to vary such port or place, Owners shall issue such revised instructions as are necessary at any time to give effect to Charterers' revised orders and any period by which the steaming time taken to reach the alternative port or place exceeds the time which should have been taken had the Vessel proceeded thither directly shall count as laytime or, if the Vessel is on demurrage, as demurrage. Charterers shall pay Owners for additional bunkers consumed during such excess time at the replacement price as paid by Owners substantiated by copies of such documents as Charterers may require. | 316 317 318 319 320 321 322

**Vessel/Cargo Inspections/ Bunker Surveys**     25.   Charterers shall be entitled to cause their representative(s) to carry out inspections of the Vessel and/or observe cargo operations and/or ascertain the quantity and quality of the cargo, water and residues on board at any loading and/or discharge port or place. | 323 324 325

141

Charterers' representative(s), or any independent surveyor appointed by Charterers, shall be entitled to survey and take samples from any or all of the Vessel's bunker fuel tanks and non-cargo spaces at any loading and/or discharge port or place. | 326
327
328

Any exercise of, or failure to exercise, any of their rights under the foregoing provisions by Charterers shall neither increase nor reduce the respective rights and obligations of the parties under this Charter and shall not be deemed to be, nor construed as, a waiver or acceptance of any default on the part of Owners. | 329
330
331

Any delay arising solely as a result of any such inspection, survey or sampling as aforesaid shall count as laytime or, if the Vessel is on demurrage, as demurrage. If the Master refuses to permit any such inspection, survey or sampling as aforesaid Charterers shall have the right to procure the removal of the Vessel from the place at which she is lying. All time lost by reason of any such refusal by the Master, including without limitation any time used in shifting the Vessel off, and back to, such, or any other, place shall not count as laytime or, if the Vessel is on demurrage, as demurrage and any expenses incurred as a result of any such refusal, including without limitation Vessel shifting expenses, shall be paid by Owners. | 332
333
334
335
336
337
338

**Cargo Sampling**    26.    Charterers shall be entitled to require the Vessel to deviate at any time after leaving any loading port or place and to call at or off a port or place for cargo sampling purposes. Charterers undertake to obtain the consent of the owner(s) of any cargo on board at the time before requiring the Vessel to deviate as aforesaid. | 339
340
341
342

Any delay arising from Charterers' requiring the Vessel to deviate as aforesaid, based upon the period by which the steaming time taken by the Vessel to reach the next port of loading or discharge exceeds the time which should have been taken had the Vessel proceeded thither directly, shall count as laytime, or if the Vessel is on demurrage, as demurrage. Charterers shall pay Owners for additional bunkers consumed during the period of deviation at the replacement price as paid by Owners and substantiated by copies of such documents as Charterers may require and shall pay port expenses incurred by Owners at the port to which Owners were required to divert the Vessel. | 343
344
345
346
347
348
349

**Maintenance of Cargo Temperature**    27.    If Charterers so require Owners shall maintain the loaded temperature of the cargo and the Master shall advise Charterers, on a daily basis, of the temperature of such cargo in each of the Vessel's tanks. Notwithstanding the foregoing the Vessel shall not be obliged to maintain the cargo at a temperature in excess of 57degC (135degF). Owners warrant that the Vessel is capable of maintaining the cargo up to such maximum temperature throughout the laden voyage and throughout discharge of the cargo. If the Vessel fails to maintain the required temperature Owners shall be responsible for any resulting delay and any time lost thereby shall not count as laytime or, if the Vessel is on demurrage, as demurrage. Should it become necessary for the Vessel to vacate the berth because of Owners' failure to maintain the required temperature all time lost and expenses incurred shall be for Owners' account. | 350
351
352
353
354
355
356
357
358

**Cargo Heating**    28.    Charterers shall be entitled to require the Vessel to raise the temperature of the cargo above the loaded temperature up to a maximum temperature of 57deg C (135deg F) in all the Vessel's tanks. The Master shall advise Charterers, on a daily basis, of the temperature of the cargo in each of the Vessel's tanks throughout the voyage. Charterers shall reimburse Owners for the cost of additional bunkers used solely to raise the temperature of the cargo as aforesaid, as evidenced by copies of the Vessel's daily Engine Log Book for the complete laden voyage, subject to a limit of 6 tonnes per degree Celsius. Charterers shall pay for such bunkers at the replacement price paid by Owners and substantiated by copies of such documents as Charterers may require. | 359
360
361
362
363
364
365
366

**Ice on Voyage**    29.    If on passage to the nominated port or place of loading or discharge the Master finds that the port or place is inaccessible owing to ice he shall immediately request Charterers by radio for revised orders and remain outside the area of ice-bound water. The terms governing such time awaiting orders shall be in accordance with the provisions of Clause 24. Upon receipt of such request Charterers shall give orders for the Vessel to proceed to an alternative ice-free and accessible port or place where there are facilities for receiving or delivering the cargo. In this event freight shall be paid at the rate applicable under this Charter to such alternative loading or discharge port or place, and any period by which the steaming time taken to reach such alternative port or place exceeds the time which should have been taken had the Vessel proceeded thither direct shall count as laytime or, if the Vessel is on demurrage, as demurrage. | 367
368
369
370
371
372
373
374
375

**Ice at Loading/ Discharge Ports or Places**    30.    If, on or after the Vessel's arrival at a nominated port or place of loading or discharge, there is a danger of the Vessel being frozen in, the Master shall proceed to the nearest safe and ice-free position and at the same time request Charterers by radio for revised orders. Upon receipt of such request Charterers shall give orders for the Vessel either to proceed to an alternative ice-free and accessible port or place, where there is no danger of the Vessel being frozen in and where there are facilities for receiving or delivering cargo, or to return to and load or discharge at the nominated port or place. If the Vessel is ordered to an alternative port or place the sum in respect of freight and delay to be paid by Charterers shall be as provided in Clause 29, but if the Vessel loads or discharges at the nominated port or place, then, | 376
377
378
379
380
381
382
383

subject to the provisions of Clauses 19, 20 and 21, the whole of the time occupied from the receipt of Notice of Readiness to load or discharge on the Vessel's first arrival until hoses are disconnected after the completion of loading or discharge shall count as laytime, or if the Vessel is on demurrage, as demurrage. Any delay after the final disconnection of shore hoses caused by ice by reason of the Vessel returning to the nominated port or place on Charterers' instructions shall count as laytime or, if the Vessel is on demurrage, as demurrage.

| | 384 |
| | 385 |
| | 386 |
| | 387 |
| | 388 |
| | 389 |

Quarantine
    31.   Should Charterers require the Vessel to proceed to any port or place at which, at the time the Vessel is ordered to that port or place, there is quarantine time shall count as laytime or, if the Vessel is on demurrage, as demurrage whilst the Vessel is detained, but should quarantine be declared only whilst the Vessel is on passage to the port or place Charterers shall not be liable for any delay caused by such quarantine.

| 390 |
| 391 |
| 392 |
| 393 |
| 394 |

Lien
    32.   Owners shall have a lien upon the cargo for all freight, deadfreight, demurrage and the cost of recovery thereof.

| 395 |
| 396 |

Documentation
    33.   Owners undertake that throughout the currency of this Charter the Vessel shall have on board all such valid documentation as may, from time to time, be required to enable the Vessel to enter and carry out all required operations at loading or discharge ports or places and leave, without let or hindrance, all ports or places to which the Vessel may be directed under the terms of this Charter and Owners hereby expressly confirm:-

| 397 |
| 398 |
| 399 |
| 400 |
| 401 |

(a) that they shall be responsible for any loss, damage, delay or expenses; and

| 402 |

(b) that time shall not count as laytime or, if the Vessel is on demurrage, as demurrage for any period during which the Vessel is not fully and freely available to Charterers;

| 403 |
| 404 |

as a result of action taken against her by any Government, Government Organisation, competent authority, person or organisation, owing to her flag, failure to have on board valid documentation as aforesaid or any dispute relating to Owners' wages or crew employment policy or to the condition of the Vessel or her equipment.

| 405 |
| 406 |
| 407 |
| 408 |

Calls at Sullom Voe
    34.   (a) Notwithstanding Clause 45 as from the date of agreement to, and for the duration of, this Charter Owners and their agents shall observe Charterers' instructions regarding the disposal of ballast from the Vessel. For such period as aforesaid Owners shall ensure that no engine room, pumproom or other oily effluent is discharged from the Vessel and shall, if required by Charterers, produce evidence of instructions cabled by them to the Master forbidding the discharge of such effluent from the Vessel. Charterers shall pay any deadfreight arising by reason of compliance with Charterers' instructions. If, before the commencement of loading at Sullom Voe Terminal, Charterers produce to Owners evidence of non-compliance with such instructions regarding the disposal of ballast or evidence of the discharge, or apparent discharge, of such effluent Charterers may, by notice in writing, cancel this Charter without incurring any liability for damages.

| 409 |
| 410 |
| 411 |
| 412 |
| 413 |
| 414 |
| 415 |
| 416 |
| 417 |
| 418 |

(b) Owners warrant that the Vessel is capable of accepting cargo at the following minimum acceptance rates and of deballasting within the following maximum periods:-

| 419 |
| 420 |

|  | Minimum | Maximum | |
| Ship's size | Cargo Acceptance Rate | Deballasting Period | 421 |
| Up to 81,283 tonnes SDWT | 7.5 per cent of SDWT/Hour | 5 hours 30 minutes. | 422 |
| 81,284 tonnes to 162,567 tonnes SDWT | 6.6 per cent of SDWT/Hour | 8 hours 40 minutes. | 423 |
| 162,568 to 325,134 tonnes SDWT | 5.8 per cent of SDWT/Hour | 11 hours 10 minutes | 424 |
| Over 325,135 tonnes SDWT | 5.8 per cent of SDWT/Hour | 13 hours 00 minutes | 425 |
| | | | 426 |

Should the Vessel's cargo acceptance rate be less than the relevant minimum rate specified above or should the deballasting time specified above exceed the relevant maximum period the excess time required to complete loading shall be deducted from any laytime or demurrage accruing under the provisions of this Charter.

| 427 |
| 428 |
| 429 |
| 430 |

(c) Owners warrant that the Vessel shall present manifolds of 16 inch diameter, class ANSI 150 with a minimum 500 mm between flanges or reducer/spool pieces such that the quick closing coupler may operate without restrictions.

| 431 |
| 432 |
| 433 |

Calls at Nigerian Ports
    35.   Owners warrant that the Vessel is neither directly nor indirectly owned and/or chartered by South African, Namibian, Zimbabwean or Israeli companies or persons, that the Vessel is not registered in any of the aforementioned States and that the Vessel is not linked, by means of financial arrangements or mortgages, with such States.

| 434 |
| 435 |
| 436 |
| 437 |

Owners warrant that the Master, officers and crew and any supernumeraries or passengers do not, and shall not, include nationals of any of the aforementioned States or persons who were born in, or reside in, any of such States. 438 439 440

Owners warrant that the Vessel has not called at or off any port in South Africa, Namibia, or Israel within the last 2 years prior to her arrival in Nigerian waters. A port of call in this context includes calling at or off a port to receive services such as mail and/or provisions whether by helicopter or launch and not merely discharging, loading, repairing or bunkering. 441 442 443 444

Owners warrant that no stores, spare parts, provisions and packing of material on board emanate from any of the States referred to in the first paragraph of this Clause. 445 446

Bills of Lading and Indemnities

36.   Bills of Lading shall be signed as Charterers direct, without prejudice to this Charter. Charterers hereby indemnify Owners - 447 448

(a) against all liabilities that may arise from the signing of Bills of Lading in accordance with the directions of Charterers to the extent that the terms of such Bills of Lading impose more onerous liabilities than those assumed by Owners under the terms of this Charter; and 449 450 451

(b) against claims brought by holders of Bills of Lading against Owners by reason of any deviation required by Charterers under the provisions of Clauses 24 and 26. 452 453

All Bills of Lading issued under this Charter shall contain War Risks, Both-to-Blame Collision and New Jason clauses. 454 455

Unavailability of Bills of Lading Change of Receiver Change of Discharge Port or Place

If a Bill of Lading is not available at any discharge port or place to which the Vessel may be ordered by Charterers under this Charter or if Charterers require Owners to deliver cargo to a party and/or at a port or place other than as set out in the Bills of Lading, then Owners shall nevertheless discharge the cargo carried by the Vessel in compliance with Charterers' instructions, upon a consignee nominated by Charterers (hereinafter called "the Receiver") presenting reasonable identification to the Master, in consideration of the following undertakings by Charterers:- 456 457 458 459 460 461

(i) to indemnify Owners (which term shall, for the purpose of this Clause, include Owners' servants and agents) and to hold Owners harmless in respect of any liability, loss or damage of whatsoever nature which Owners may sustain by reason of delivering the cargo to the Receiver in accordance with Charterers' instructions; 462 463 464 465

(ii) to provide Owners, in the event of any proceedings being commenced against Owners in connection with the delivery of the cargo as aforesaid, from time to time on demand, with sufficient funds to defend the same; 466 467 468

(iii) to provide Owners on demand such bail or other security as may be required if, in connection with the delivery of the cargo as aforesaid, the Vessel or any other vessel or property belonging to Owners should be arrested or detained or, if the arrest or detention thereof should be threatened, to prevent such arrest or detention, or to secure the release of such Vessel or property and to indemnify Owners in respect of any loss, damage or expenses caused by such arrest or detention whether or not the same be justified; and 469 470 471 472 473

(iv) to produce and deliver to Owners all original Bills of Lading in respect of the cargo loaded by the Vessel as soon as same shall have arrived and/or come into the possession of Charterers whereupon Charterers' liability hereunder shall cease. 474 475 476

The provisions of the foregoing undertakings shall be governed by English Law. 477

Coding of Cargo Documentation - US Customs Regulations

37.   If Charterers require the Vessel to load or discharge at a port or ports within the jurisdiction of the US Customs Service, Owners shall procure that the Master complies with Charterers' instructions as to the insertion of Owners' Unique Identifier in each Bill of Lading accompanying a shipment of imported cargo in accordance with US Customs Regulations (19 CFR Parts 4 and 178). Owners shall provide Charterers or their agents on request with details of their Unique Bill of Lading Identifier in respect of any cargo carried hereunder. 478 479 480 481 482 483

In the event that the Master fails to comply with Charterers' instruction as aforesaid Owners shall be liable for any delays resulting therefrom and any time lost thereby shall not count as laytime or, if the Vessel is on demurrage, as demurrage. 484 485 486

Liberty

38.   The Vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress, to call at any port or ports for bunkers, and to deviate for the purpose of saving life or property, 487 488

or for any other reasonable purpose. 489

**Agency** 39.   Charterers shall nominate the Vessel's agents at loading and discharge ports or places but such agents shall be employed, instructed and paid by Owners. 490 491

**Estimated Times of Arrival** 40.   If the Master fails to comply with any of the following provisions any delay, either at a loading or discharge port or place, resulting therefrom shall not count as laytime or, if the Vessel is on demurrage, as demurrage and Owners shall be responsible for any additional costs incurred by Charterers arising from such non-compliance. 492 493 494 495

The Master shall send messages by radio or telex to Charterers addressed 'BP Shipping London' and to the agents at the loading port or place advising the date and approximate hour of the Vessel's arrival. Such messages shall be sent upon the Vessel's sailing from the prior discharge port and 7 days and 72, 48 and 24 hours prior to the Vessel's estimated arrival at the loading port or place. Should the Vessel be at sea or elsewhere when ordered by Owners to proceed to the loading port or place the Master shall, if the Vessel is less than 7 days or 72/48/24 hours, as applicable, from the loading port or place, immediately notify Charterers and the agents of the Vessel's ETA in the manner aforesaid and thereafter notify Charterers and the agents of the Vessel's ETA at such of the times as aforesaid as are applicable or immediately provide Charterers with such other ETAs as Charterers may request. 496 497 498 499 500 501 502 503 504

The Master shall notify Charterers and the agents of the Vessel's ETA at the discharge port or place in the manner aforesaid also providing information as to the Vessel's expected arrival draught on even keel salt water either upon the Vessel leaving the previous port or place or 72 hours prior to her estimated arrival at the discharge port or place, whichever is the later. Thereafter the Master shall notify Charterers and the agents of the Vessel's ETA together with the information as aforesaid 48 and 24 hours, as applicable, from the discharge port or place or immediately provide Charterers with such other ETAs as Charterers may request. 505 506 507 508 509 510 511

The Master shall advise Charterers and the agents promptly by radio or telex of any variation of more than 6 hours in estimated dates or times of arrival at the loading and/or discharge port or place. 512 513

Should the voyage involve passing the Cape of Good Hope the Master shall, on passing the Cape of Good Hope, send an additional radio or telex message to Charterers, advising the Vessel's ETA off Land's End or at the discharge port or place if already nominated, stating also the estimated arrival draught on even keel salt water. 514 515 516 517

Charterers shall have the right to see copies of all telexes (showing answerbacks) referred to in this Clause. 518

**Sub-Charter** 41.   Charterers may sub-charter the Vessel without prejudice to the respective rights and obligations of either party under this Charter. 519 520

**Cargo Insurance** 42.   Any additional premium which might be placed on the cargo insurance by reason of the Vessel's age and/or condition shall be for Owners' account, and Charterers shall be entitled to deduct the cost of any such additional premium from the freight. 521 522 523

**Bunker Fuel** 43.   If the supply of bunker fuel required for the voyage performed under this Charter should not at the material date be covered under a contract between Owners and any of the BP Group of Companies, the first option of supplying such bunker fuel shall be given by Owners to a Company within the BP Group. 524 525 526

**Traffic Separation and Routeing** 44.   Owners shall instruct the Master to observe recommendations as to traffic separation and routeing as issued from time to time by the International Maritime Organisation or as promulgated by the State of the flag of the Vessel or the State in which the effective management of the Vessel is exercised. 527 528 529

**Oil Pollution Prevention** 45.   Owners shall instruct the Master to retain on board all oily residues of oil of a persistent nature remaining in the Vessel from the previous cargo. The Master shall, during tank washing, collect the washings into one cargo compartment and after maximum separation of the free water, discharge the water so separated overboard. In the discharge of all water separated as aforesaid Owners shall comply with the requirements of the International Convention for the Prevention of Pollution from Ships 1973, as amended by its Protocol of 1978 (MARPOL 73/78), insofar as these do not conflict with any applicable law. 530 531 532 533 534 535

When this operation is completed the Master shall notify Charterers by radio of the estimated tonnage of all segregated tank washings from previous cargoes. 536 537

**Treatment of Tank Washings** On the Vessel's arrival at the loading port or place the Master shall arrange that the quantity of all segregated tank washings shall be measured in conjunction with cargo suppliers and shall make a note in 538 539

the Vessel's ullage record of the quantity so measured. | 540

If Charterers require the Master to load the cargo on top of the segregated tank washings, freight
calculated in accordance with Clause 6 shall be paid on that quantity of the tank washings up to a tonnage
equivalent of 1% of the Vessel's summer deadweight. Owners shall instruct the Master to keep the water
to a minimum and in any event not exceeding 0.15% of the Vessel's summer deadweight tonnage. | 541 542 543 544

If Charterers require the Master to segregate the tank washings from the cargo to be loaded, Charterers
shall pay for any deadfreight so incurred. | 545 546

If, for whatever reason, the cargo loaded hereunder is not loaded on top of the segregated tank washings
from previous cargoes (or any part thereof), Owners undertake that all such washings shall be discharged
or disposed of or retained in accordance with the orders and directions of Charterers on completion of the
voyage hereunder. | 547 548 549 550

**Exceptions**   46.   The provisions of Articles III (other than Rule 8), IV, IV bis and VIII of the Schedule to the Carriage
of Goods by Sea Act, 1971 of the United Kingdom shall apply to this Charter and shall be deemed to be
inserted in extenso herein. This Charter shall be deemed to be a contract for the carriage of goods by sea to
which the said Articles apply, and Owners shall be entitled to the protection of the said Articles in respect
of any claim made hereunder.   . | 551 552 553 554 555

Charterers shall not, unless otherwise in this Charter expressly provided, be responsible for any loss or
damage or delay or failure in performance hereunder arising or resulting from Act of God, act of war,
seizure under legal process, quarantine restrictions, labour disputes, strikes, riots, civil commotions, arrest
or restraint of princes, rulers or peoples. | 556 557 558 559

**War Risks**   47.   (a) The Master shall not be required or bound to sign Bills of Lading for any blockaded port or for
any port which the Master or Owners in his or their discretion consider dangerous or impossible to enter
or reach. | 560 561 562

(b) If - | 563
(i) any port of loading or of discharge named in this Charter or to which the Vessel may properly be
ordered pursuant to the terms of this Charter or the Bills of Lading be blockaded: or | 564 565

(ii) owing to any war, hostilities, warlike operations, civil war, civil commotions, revolutions, or the
operation of international law:- | 566 567

(aa) entry to any such port of loading or of discharge or the loading or discharge of cargo at any port
be considered by the Master or Owners in his or their discretion dangerous or prohibited, or | 568 569

(bb) it be considered by the Master or Owners in his or their discretion dangerous or impossible for
the Vessel to reach any such port of loading or of discharge, | 570 571

then Charterers shall have the right to order the cargo or such part of it as may be affected to be loaded or
discharged at any other port of loading or of discharge whether within or outside the range of loading or
discharge ports respectively established under the provisions of this Charter (provided such other port is
not blockaded or that entry thereto or loading or discharge of cargo thereat is not in the Master's or Own-
ers' discretion dangerous or prohibited). If no orders are received from Charterers within 48 hours after
they or their agents have received from Owners a request for the nomination of a substitute port, then: | 572 573 574 575 576 577

if the affected port is the first and only loading port and no cargo has been loaded, this Charter
shall terminate forthwith; | 578 579

if the affected port is a loading port and part of the cargo has already been loaded, the Vessel
may proceed on passage and Charterers shall pay for any deadfreight so incurred; | 580 581

if the affected port is a discharge port, Owners shall be at liberty to discharge the cargo at any safe
port which they or the Master may in their or his discretion decide on (whether within or outside the
range of discharge ports established under the provisions of this Charter) and such discharge
shall be deemed to be due fulfilment of the contract or contracts of affreightment so far as cargo so
discharged is concerned. | 582 583 584 585 586

In the event of the cargo being loaded or discharged at any such other port within the respective range of
loading or discharge ports established under the provisions of this Charter, this Charter shall be read in re-
spect of freight and all other conditions whatsoever as if the voyage performed were that originally
designated. However if the Vessel discharges the cargo at a port outside the range of discharge ports estab- | 587 588 589 590

lished under the provisions of this Charter, freight shall be paid as for the voyage originally designated and 591
all extra expenses involved in reaching the actual port of discharge and/or discharging the cargo thereat 592
shall be paid by Charterers . In the latter event Owners shall have a lien on the cargo for all such extra 593
expenses. 594

(c) The Vessel shall have liberty to comply with any directions or recommendations as to departure, 595
arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatso- 596
ever given by the government of the nation under whose flag the Vessel sails or any other government or 597
local authority including any de facto government or local authority or by any person or body acting or 598
purporting to act as or with the authority of any such government or authority or by any committee or 599
person having under the terms of the war risks insurance on the Vessel the right to give any such directions 600
or recommendations. If by reason of or in compliance with any such directions or recommendations 601
anything is done or is not done such shall not be deemed a deviation. 602

If by reason of or in compliance with any such direction or recommendation the Vessel does not proceed to 603
the port or ports of discharge originally designated or to which she may have been ordered pursuant to the 604
terms of the. Bills of Lading, the Vessel may proceed to any safe port of discharge which the Master or 605
Owners in his or their discretion may decide on and there discharge the cargo. Such discharge shall be 606
deemed to be due fulfilment of the contract or contracts of affreightment and Owners shall be entitled to 607
freight as if discharge had been effected at the port or ports originally designated or to which the Vessel 608
may have been ordered pursuant to the terms of the Bills of Lading. All extra expenses involved in reaching 609
and discharging the cargo at any such other port of discharge shall be paid by Charterers and Owners shall 610
have a lien on the cargo for freight and all such expenses. 611

**Both to Blame Collision**    48.   If the liability for any collision in which the Vessel is involved while performing this Charter falls to 612
be determined in accordance with the laws of the United States of America, or the laws of any State which 613
applies laws similar to those applied in the USA in the circumstances envisaged by this Clause, the 614
following Clause shall apply:- 615

"If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and 616
any act, neglect or default of the Master, mariner, pilot or the servants of the carrier in the navigation or 617
in the management of the Vessel, the owners of the goods carried hereunder will indemnify the carrier 618
against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability 619
represents loss of, or damage to, or any claim whatsoever of the owners of, said goods, paid or payable by 620
the other or non-carrying vessel or her owners to the owners of said goods and set off, recouped or 621
recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying 622
vessel or carrier. 623

The foregoing provisions shall also apply where the owner, operators or those in charge of any vessel or 624
vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of 625
collision or contact." 626

Whilst Charterers shall procure that all Bills of Lading issued under this Charter shall contain a provision 627
in the foregoing terms, to be applicable where the liability for any collision in which the Vessel is involved 628
falls to be determined in accordance with the preamble of this Clause, Charterers neither warrant nor 629
undertake that such provision shall be effective. In the event that such provision proves ineffective 630
Charterers shall, notwithstanding anything to the contrary herein provided, not be obliged to indemnify 631
Owners. 632

**General Average**    49.   General Average shall be adjusted and settled in London in accordance with the York/Antwerp 633
Rules 1974 or any modification or re-enactment thereof for the time being in force. 634

**New Jason**    50.   If, notwithstanding Clause 49, it is agreed in writing that General Average adjustment be made in 635
accordance with the law and practice of the United States of America, the following Clause shall apply:- 636

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, 637
resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence 638
of which, the carrier is not responsible, by statute, contract or otherwise, the cargo shippers, consignees or 639
owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, 640
losses or expenses of a general average nature that may be made or incurred and shall pay salvage and 641
special charges incurred in respect of the cargo. 642

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving 643
ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover 644
the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be 645
made by the cargo shippers, consignees or owners of the cargo to the carrier before delivery". 646

FMC Certificate/
US Coastguard
Regulations

51.   Owners undertake that the Vessel carries on board a valid US Coast Guard Certificate of Financial    647
Responsibility as required under the US Federal Water Pollution Control Act as amended by the Clean    648
Water Act of 1977. Any delay arising from failure by Owners to have such a Certificate on board the Vessel    649
shall not count as laytime or, if the Vessel is on demurrage, as demurrage.    650

Owners warrant that during the period of this Charter the Vessel shall comply with all applicable US Coast    651
Guard Regulations and that if in any respect whatsoever the Vessel does not so comply there shall be on    652
board the Vessel appropriate waivers from the US Coast Guard. Any delay arising from non-compliance    653
with the foregoing provision shall not count as laytime or, if the Vessel is on demurrage, as demurrage.    654

Clause
Paramount

52.   All Bills of Lading issued under this Charter shall contain the following Clause Paramount:-    655

"CLAUSE PARAMOUNT    656

This Bill of Lading shall:    657

(1) in relation to the carriage of any goods from any port in Great Britain or Northern Ireland to any other    658
port whether in or outside Great Britain or Northern Ireland have effect subject to the provisions of the    659
Carriage of Goods by Sea Act 1971 and to the Rules contained in the Schedule thereto (the Hague/Visby    660
Rules) and nothing herein contained shall be deemed a surrender by the Carrier of any of his rights or    661
immunities or an increase of any of his responsibilities or liabilities under the said Act;    662

(2) in relation to the carriage of any goods from any port in a state in which legislation similar in effect to    663
the Carriage of Goods by Sea Act 1971 of the United Kingdom is in force to any port in any other state, have    664
effect subject to such legislation and to the Rules contained in the Schedule thereto and nothing herein    665
contained shall be deemed a surrender by the Carrier of any of his rights or immunities or an increase of    666
any of his responsibilities or liabilities under the said legislation;    667

(3) in relation to the carriage of any goods between ports in two different states, where this Bill of Lading    668
is issued in Great Britain, Northern Ireland or any state in which legislation similar in effect to the    669
Carriage of Goods by Sea Act 1971 of the United Kingdom is in force have effect subject to such Act or such    670
legislation and to the Rules contained in the Schedule thereto and nothing herein contained shall be deemed    671
a surrender by the Carrier of any of his rights or immunities or an increase of any of his responsibilities or    672
liabilities under the said Act or said legislation;    673

(4) in any other case have effect as if the contract of carriage herein contained were a contract of carriage    674
to which the provisions of the Carriage of Goods by Sea Act 1971 of the United Kingdom applied and the    675
Carrier shall be entitled to the benefit of the privileges, rights and immunities conferred by the said Act and    676
the Rules contained in the Schedule thereto as if the same were herein specifically set out.    677

Notwithstanding the foregoing provisions of this Clause the Hague/Visby Rules shall not apply to this    678
contract where the goods carried hereunder consist of cargo which by this contract is stated as being    679
carried on deck and is so carried.    680

If any term of this Bill of Lading be repugnant to the provisions of the Hague/Visby Rules such term shall    681
be void to that extent but no further."    682

TOVALOP

53.   Owners warrant that the Vessel is a Participating Tanker in TOVALOP and will so remain during    683
this Charter, provided however that nothing herein shall prevent Owners, upon prior notice to Charterers,    684
from withdrawing from TOVALOP under Clauses III(B) or X thereof, and provided further that upon any    685
withdrawal under Clause III(B) or under Clause X, following an amendment to TOVALOP which does not    686
materially increase the obligations of the Parties thereunder, Charterers shall have the option to terminate    687
this Charter.    688

When an escape or discharge of Oil occurs from the Vessel and causes or threatens to cause Pollution    689
Damage, or when there is the Threat of an escape or discharge of Oil (i.e. a grave and imminent danger of    690
the escape or discharge of Oil which, if it occurred would create a serious danger of Pollution Damage),    691
then Charterers may, at their option, upon notice to Owners or the Master, undertake such measures as are    692
reasonably necessary to prevent or minimise such Damage or to remove the Threat, unless Owners    693
promptly undertake the same. Charterers shall keep Owners advised of the nature and result of any such    694
measures taken by them, and, if time permits, the nature of the measures intended to be taken by them. Any    695
of the aforementioned measures taken by Charterers shall be deemed taken on Owners' authority and as    696
Owners' agent, and shall be at Owners' expense except to the extent that:    697

(a) any such escape or discharge or Threat was caused or contributed to by Charterers; or    698

(b) by reason of the exceptions set out in Article III, paragraph 2, of the 1969 International Convention on Civil Liability for Oil Pollution Damage, Owners are, or, had the said Convention applied to such escape or discharge or to the Threat, would have been, exempt from liability for the same; or

(c) the cost of such measures together with all other liabilities, costs and expenses of Owners arising out of or in connection with such escape or discharge or Threat removal exceeds One Hundred and Sixty U.S. Dollars per ton or Sixteen Million Eight Hundred Thousand U.S. Dollars, whichever is the lesser, save insofar as Owners shall be entitled to recover such excess under either the 1971 International Convention on the Establishment of an International Fund for Compensation for Oil Pollution Damage or under CRISTAL, provided that in any incident to which the TOVALOP Supplement applies the Owners' limit of liability hereunder shall be that provided for in the said Supplement;

PROVIDED ALWAYS that if Owners in their absolute discretion consider said measures should be discontinued, Owners shall so notify Charterers and thereafter Charterers shall have no right to continue said measures under the provisions of this Clause and all further liability to Charterers under this Clause shall thereupon cease.

The above provisions are not in derogation of such other rights as Charterers or Owners may have under this Charter or may otherwise have or acquire by Law or any International Convention or TOVALOP.

For the purposes of this Clause, the meaning of the terms "Oil" and "Pollution Damage" shall be as defined in TOVALOP and "ton" shall be understood in relation to "tonnage" as defined therein.

The BP Shipping Questionnaire    54.  During pre-fixture negotiations leading to agreement between Owners and Charterers to the terms and conditions of this Charter Owners have, either in consultation with their brokers or otherwise, provided Charterers with a completed BP Shipping Questionnaire a copy of which shall be attached hereto as Appendix I.

Owners warrant that the responses to the BP Shipping Questionnaire provided by or on behalf of them are correct. If any response as provided by or on behalf of Owners proves to be incorrect Charterers shall be entitled either:-

(a) to cancel this Charter forthwith without prejudice to any other rights available to them under this Charter or otherwise under English Law; or

(b) to recover, by deduction from freight, any losses, costs, damages or expenses incurred as a direct result of Owners' breach of warranty.

In the event of any conflict arising between any provision(s) in the body of this Charter and any provision(s) in Appendix 1 the provision(s) contained in the body of this Charter shall prevail.

Law    55.  The construction, validity and performance of this Charter shall be governed by English Law. The High Court in London shall have exclusive jurisdiction over any dispute which may arise out of this Charter.

*In Witness Whereof* the parties have caused this Charter to be executed as of the date first above written

..............................................................................

for and on behalf of

..........................................................................................................................OWNERS

..............................................................................

for and on behalf of BP SHIPPING LIMITED as agents for

.................................................................... CHARTERERS

APPENDIX I

## The BP Shipping Questionnaire

**All questions must be answered and questions that are not applicable must be marked N/A and initialled.**

| | |
|---|---|
| 1. Vessel's Name: | |
| 2. Previous Name(s): | |
|       Date changed | |
| 3. Flag: | |
| 4. Port of Registry: | |
| 5. Built at: | |
|       Year | |
| 6. Vessel's details: | |
|       Summer Dwt | |
|       Summer Draught | |
|       L.O.A | |
|       Beam | |
|       Bow to centre of manifold | |
|       Keel to top of mast | |
|       TPI/TPC | |
|       Are Vessel's tanks fully coated? | |
|       Is Vessel SBT, CBT or COW? | |
|       Maximum speed (fully loaded) | |
|       Call sign | |
|       INMARSAT No. | |
| 7. Registered Owner: | |
|       (a) Full Name Style | |
|       (b) Full Address | |
|       (c) Telephone No. | |
|       (d) Telex No. | |
|       (e) US Standard Carrier Alpha Code | |

| | |
|---|---|
| 8. Demise Charterer if any: | |
| (a) Full Name Style | |
| (b) Full Address | |
| (c) Telephone No. | |
| (d) Telex No. | |
| (e) US Standard Carrier Alpha Code | |
| 9. Company responsible for the day to day operation of the Vessel (hereinafter called 'Managers'): | |
| (a) Full Name Style | |
| (b) Full Address | |
| (c) Telephone No. | |
| (d) Telex No. | |
| (e) US Standard Carrier Alpha Code | |
| 10. Manning Agents (if different from 9): | |
| (a) Full Name Style | |
| (b) Full Address | |
| (c) Telephone No. | |
| (d) Telex No. | |
| 11. How long has Vessel been with present Managers? | |
| 12. Number of Tankers in Managers' Fleet: | |
| 13. Classification Society and Vessel's Class: | |
| 14. Number of years in present Classification Society: | |
| 15. Does the Vessel have the following certificates on board which will be valid for the period of the expected voyage? | |
| (a) Loadline Certificate | |
| (b) Safety Equipment Certificate | |
| (c) Safcon Certificate | |
| (d) Safety Radio Certificate | |
| (e) International Oil Pollution Prevention (IOPP) Certificate | |
| (f) United States Coast Guard (USCG) (Financial Responsibility Certificate) | |
| (g) Civil Liability Certificate (CLC) | |
| (h) TOVALOP Certificate | |

| | |
|---|---|
| 16. Does the vessel comply with the provisions of the USCG regulations? | |
| Has it any outstanding violations? | |
| If 'yes', give details | |
| 17. Is the Vessel equipped with nautical publications and navigational equipment in good working order in accordance with SOLAS 74 and its amendments? | |
| 18. History of accidents, including significant mechanical difficulties, stranding, collisions or other serious occurrences over previous 12 months (include full details on additional sheet if necessary): | |
| When | |
| Where | |
| Circumstances | |
| 19. History of pollution incidents over previous 12 months (include full details on additional sheet if necessary): | |
| When | |
| Where | |
| Circumstances | |
| Any port prohibitions resulting from pollution? | |
| 20. P and I Club in which vessel entered: | |
| 21. Vessel's Insured Value: | |
| 22. Does the Vessel have a full complement of Certificated Officers and Crew in accordance with the requirements of the Flag State? | |
| 23. Licence/Certificate origin of Master and Officers: | |
| 24. Nationality of Master and Officers: | |
| 25. Does the Master understand spoken and written English? | |
| 26. Have the Vessel's Owners/Demise Charterers/Managers signed a Sea Carrier Initiative Agreement with the US Customs Service concerning drug abuse? | |
| Do any of the aforementioned have an anti-drug abuse policy in force on board the Vessel? | |
| 27. What steps have been taken by the Vessel's Owners/Demise Charterers/Managers to control the consumption of alcohol on board the Vessel? | |
| 28. Have the Vessel's Owners/Demise Charterers/Managers taken steps to ensure that the Master, Officers and Crew comply with current United States Alcohol Regulations applicable to ships in US waters? | |
| 29. Has any of the Master, Officers and Crew of the Vessel ever been convicted of any offence whatsoever concerning drug or alcohol abuse? | |
| If so, provide the date(s), nature and detail(s) of the offence: | |
| 30. Is the Vessel operated in accordance with the recommendations contained in the latest edition of ICS/OCIMF 'International Safety Guide for Oil Tankers and Terminals' (ISGOTT)? | |

| | |
|---|---|
| 31. Does the Vessel comply with the latest edition of OCIMF 'Standards for Equipment Employed in The Mooring of Vessels at Single Point Moorings' (SPM)? | |
| 32. Does the Vessel comply with the latest edition of OCIMF 'Guidelines and Recommendations for The Safe Mooring of Large Vessels at Piers and Sea Islands' (130,000SDW+)? | |
| 33. Does the Vessel comply with the latest edition of OCIMF 'Standards for Oil Tankers Manifolds and Associated Equipment', applicable for its size? | |
| 34. Is the Vessel able to comply with the latest edition of ICS/OCIMF 'Ship to Ship Transfer Guide'? | |
| 35. Is IGS fitted and in full working order in accordance with SOLAS 74 and its amendments? | |
| 36. Is COW fitted and in full working order in accordance with MARPOL 73/78? | |
| 37. Is the Vessel capable of performing COW concurrent with cargo discharge? | |
| 38. Are sufficient Officers certificated to perform COW operations in accordance with MARPOL 73/78? | |
| 39. Is the Vessel able to operate Closed Loading in accordance with Section 7.6.3 of ISGOTT? | |
| 40. Last tanker under these Managers to have been chartered to any BP Group company:<br><br>Date | |
| 41. Last three Charterers:<br><br>(a)<br><br>(b)<br><br>(c) | |
| 42. Last three cargoes grade/type:<br><br>Specify for example: type of crude, high/low sulphur content, leaded/unleaded<br><br>(a)<br><br>(b)<br><br>(c) | |
| 43. Nature and quantity of any residues on board: | |
| 44. Do residues contain any chemicals/solvents (e.g. from tank cleaning carried out during the last three tank cleaning operations)? | |
| 45. If 'yes', state the nature of the chemical/solvent used: | |
| 46. List in full Unique Bill of Lading Indentifying Number(s) to be used on each set of cargo documents (appertaining to each Bill of Lading) to be presented to U.S. Customs (if Vessel fixed for U.S. options): | |

BPS/PRU /Quest4.cm3/2/3/89

# PRODUCT TRANSPORT CORP LTD

3RD FLOOR, PAR LA VILLE, 14 PAR-LA-VILLE ROAD, HAMILTON BERMUDA
P.O BOX HM 2257, HAMILTON BERMUDA HM JX
TELEPHONE:BERMUDA (441) 295-6875
FAX:(441) 295-6796

**INVOICE NO.**    200866

Ocean And Oil

PLEASE REFER TO INVOICE NO.
WHEN REMITTING

INVOICE DATE    7/13/2006

CUST REF        AQU-VOY36 DEM

| VESSEL | VOY. NO. | C/P DATE | FIXTURE NO. |
|--------|----------|----------|-------------|
| AQUIDNECK | 36 | 4/13/2006 | |

| TERMS OF PAYMENT | | B/L DATE | DUE DATE |
|------------------|--|----------|----------|
| IMMEDIATE | | | 7/12/2006 |

| DESCRIPTION | | AMOUNT USD |
|-------------|--|------------|

**DEMURRAGE INVOICE**

| | | |
|--|--|--|
| Demurrage (per laytime calc) | 19,500.00 | 203,910.42 |
| Demurrage paid on acct | 19,500.00 | -81,124.00 |
| ($26,812.50 + $54,311.50) | | |
| | | |
| Total: | | 122,786.42 |

E. & O. E.

REMIT TO
AQUIDNECK SHIPPING CORP
A/C 54870102
NORDEA BANK
LONDON, ENGLAND
SWIFT: NDEAGB2L
via JPMORGAN CHASE BANK
SWIFT CHASUS33
ABA 021000021



EXHIBIT
B